## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY )
378 Main Street )
Tucson, AZ 85701; )
)
DEFENDERS OF WILDLIFE )          Case No.: _____
1130 17th Street NW )
Washington, DC 20036; )
)
    and )
)
SAVE THE MANATEE CLUB )
533 Versailles Dr., Ste 100 )
Maitland, FL 32751, )
)
    *Plaintiffs*, )
)
        v. )
)
U.S. FISH AND WILDLIFE SERVICE )
1849 C Street NW )
Washington, DC 20240, )
)
    *Defendant.* )
)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.    Plaintiffs Center for Biological Diversity (Center), Defenders of Wildlife (Defenders), and Save the Manatee Club challenge the unlawfully withheld and/or unreasonably delayed actions by the U.S. Fish and Wildlife Service (FWS) in failing to take final action on Plaintiffs' "Petition for a Rule to Revise Critical Habitat for the Florida Manatee" dated December 19, 2008 (2008 Petition). In particular, FWS has failed to propose and finalize a regulation to revise the critical habitat designation for the Florida manatee, despite finding in January 2010 that a revision of critical habitat is "warranted" in order to provide for the conservation of the manatee. 75 Fed. Reg. 1574 (Jan. 12, 2010). Critical habitat designation is one of the essential mechanisms embodied in the Endangered Species Act (ESA) for ensuring the survival and effectuating the recovery of imperiled species such as the Florida manatee.

2.    The Florida manatee (*Trichechus manatus latirostris*)[1] was listed in the first class of endangered species in 1967 under the Endangered Species Preservation Act, the forerunner to the ESA. FWS designated critical habitat for the manatee in 1976, delineating waterways in Florida that were known to be important concentration areas for manatees at that time.

3.    On December 19, 2008, the Center, Defenders, and Save the Manatee Club petitioned FWS under the Administrative Procedure Act (APA) and ESA to undertake a rulemaking to revise critical habitat for the Florida manatee because, during the preceding three decades, Congress and FWS had changed the meaning of critical habitat, the original critical habitat designation lacked elements required by those changes, and new scientific information existed regarding where and how manatees used habitat since the designation.

---

[1] References to "manatee" in this complaint refer to the Florida manatee.

1

4.      More than a decade ago, FWS determined that the revision was "warranted" to protect the manatee's habitat and promote the species' recovery. This determination was consistent with FWS's earlier findings, in its own formal recovery plans for the manatee, that the manatee's critical habitat designation was outdated and needed to be revised. Yet FWS has never undertaken the rulemaking process required to implement that long-overdue revision.  Nor, given FWS's egregious delay, is there any likelihood that FWS will embark on the rulemaking in the near future absent relief from this Court.

5.      Meanwhile, Florida manatees and their habitat continue to face dire and imminent threats, including the loss of warm-water refuges and poor water quality that causes persistent harmful algal blooms and a profound loss of seagrass, a crucial food source, leading to mass starvation. Compounding these threats are a growing number of boat strikes and severe weather events caused by climate disruption.

6.      In 2021, more than 1,100 Florida manatees died due to cold-related stress, starvation, boat strikes, and toxic red tides. This reflects approximately 13% of the manatee's estimated total population and is more than double its five-year annual mortality average.

7.      Given the ever-worsening threats to the Florida manatee and its habitat, and in light of the agency's obligations to protect this species, FWS's protracted failures to propose and finalize a regulation to revise critical habitat in response to Plaintiffs' 2008 Petition constitute agency actions unlawfully withheld and unreasonably delayed in violation of the ESA and APA. Plaintiffs seek declaratory and injunctive relief to remedy these violations, including an order from the Court setting dates certain for FWS to act.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action under 16 U.S.C. § 1540(g) (ESA

citizen suit provision)[2] as well as 28 U.S.C. § 1331 because this case presents a federal question

under the laws of the United States, including the ESA and APA. An actual, justiciable

controversy exists between Plaintiffs and FWS. The APA waives FWS's sovereign immunity. 5

U.S.C. § 702. The requested relief is proper under 28 U.S.C. §§ 2201–2202 (Declaratory

Judgment Act) and 5 U.S.C. §§ 701–706 (APA).

9.     Venue in this Court is proper under 28 U.S.C. § 1391(e)(1). This action is brought

against FWS, an agency of the United States, headquartered in Washington, DC. The

Department of the Interior, of which FWS is a component agency, is headquartered in

Washington, DC. In addition, Plaintiff Defenders is headquartered in Washington, DC, and

Plaintiff Center maintains an office in this judicial district.

## PARTIES

### Plaintiffs

10.     Plaintiff Center is a nonprofit 501(c)(3) organization incorporated in the State of

California with offices across the country, including in Washington, D.C., Arizona, California,

Florida, New York, North Carlina, Oregon, and Washington, and in Baja California Sur, Mexico.

The Center works through science and environmental law to advocate for the protection of

endangered, threatened, and rare species and their habitats both in the United States and abroad.

The Center has over 81,800 active members, including members who reside in and travel to

areas where manatees feed, breed, and migrate.

---

[2] Plaintiffs provided notice of their intent to sue FWS for these violations more than 60 days ago.

11.     The Center brings this action on behalf of itself and its members, many of whom enjoy observing, photographing, and appreciating the Florida manatee in its natural habitat. The Center's members regularly engage in these activities in various locations within Florida from land and water and will continue to do so in the future.

12.     For example, one of the Center's members resides in St. Petersburg, Florida, but travels throughout Florida in the hopes of seeing wildlife, including the Florida manatee. She photographs manatees while diving in their habitat, including in springs and nearshore waters of St. Petersburg, St. Augustine, and the Florida Keys. She went on at least ten dive trips in the summer of 2021 and has concrete plans to continue visiting these areas to see manatees and their habitat in 2022 and the foreseeable future.

13.     Plaintiff Defenders is a nonprofit 501(c)(3) membership organization dedicated to the protection and restoration of all native wild animals and plants in their natural communities and the preservation of the habitats on which these species depend. Headquartered in Washington, D.C., Defenders has regional and field offices in Alaska, Arizona, California, Colorado, Florida, Montana, New Mexico, North Carolina, Ohio, Oregon, Texas, Washington, and Wyoming. Defenders has nearly 2.2 million members and activists across the United States, including more than 124,000 living in Florida where manatees live, feed, breed, and migrate.

14.     Defenders brings this action on behalf of itself and its members, many of whom enjoy observing, photographing, and appreciating the Florida manatee in its natural habitat. Defenders' members regularly engage in these activities in various locations within Florida from land and water and will continue to do so in the future.

15.     For example, one of Defenders' members enjoys viewing manatees as often as she can. A deciding factor in where she chose to live—Winter Park, Florida—was that the city is

near areas where she could view manatees. She enjoys regularly visiting a manatee aggregation site in Blue Springs State Park in Orange City, Florida on any day when the temperature is cool enough and she does not have conflicting obligations. This member has plans to see manatees in the immediate future, including in January 2022. She is also the Advocacy Committee Co-Chair of the Free the Ocklawaha River Coalition for Everyone, participates in the twice-yearly Manatee Forum meeting hosted by the Florida Fish and Wildlife Conservation Commission (FWC), and produces policy and outreach materials, comment letters, blog posts, and social media posts about manatees. Moreover, this member has engaged in pro bono work to support manatee conservation.

16.     Plaintiff Save the Manatee Club is a nonprofit 501(c)(3) membership organization dedicated to the conservation of manatees. The organization was founded in 1981 by singer and songwriter Jimmy Buffett and Governor of Florida Bob Graham. There are currently about 40,000 active members of SMC.

17.     Save the Manatee Club brings this action on behalf of itself and its members, many of whom enjoy observing, photographing, and appreciating the Florida manatee in its natural habitat. Save the Manatee Club is located in Maitland, Florida. Save the Manatee Club members regularly engage in these activities in various locations within Florida from land and water and will continue to do so in the future.

18.     For example, one of Save the Manatee Club's longtime members is a native Floridian who lives in Sanford and enjoys traveling around the region and state during the winter months each year to see aggregations of wintering manatees. Her love of observing manatees and sharing her passion for them led her to start volunteering in manatee conservation efforts over the past several years, which she plans to continue doing indefinitely. One of her greatest joys is

giving presentations to school children at Blue Spring State Park to educate them about manatees and the importance of Florida's natural springs for the species. This member-volunteer participates broadly in education, outreach, and conservation programs advocating for, enjoying, and fostering a passion in others for manatees and their conservation both in her region and to visitors from all over the world. This member has concrete plans to continue these efforts, view manatees across the state, and engage people of all ages and backgrounds in observing and conserving manatees in 2022 and beyond.

19.     Plaintiffs and Plaintiffs' members are harmed by FWS's failure to propose and finalize a regulation in response to Plaintiffs' 2008 Petition to revise the manatee's designated critical habitat designation as required by the ESA and APA. These failures are impeding the survival and recovery of manatees, thereby decreasing Plaintiffs' members' opportunities to observe and enjoy them in their natural habitats, and are facilitating the degradation and destruction of manatee habitat in locations where Plaintiffs go to observe and enjoy manatees and their habitats.

20.     FWS's failure to revise manatee critical habitat in response to Plaintiffs' 2008 Petition also harms and will continue to harm Plaintiffs' and their members' procedural interests in ensuring prompt and lawful compliance with the ESA and APA, statutes that protect Plaintiffs' and their members' underlying substantive interests in manatee protection and recovery.

21.     An order from the Court directing FWS to complete rulemaking to revise the long-overdue critical habitat designation for the Florida manatee will remedy Plaintiffs' injuries by helping to protect and recover manatees and protect manatee habitat in the areas where Plaintiffs' members observe and enjoy the species.

**Defendant**

22.     Defendant U.S. Fish and Wildlife Service is a federal agency within the U.S.
Department of the Interior. The Secretary of the Interior has delegated authority to administer the
ESA to FWS with respect to Florida manatees. This authority encompasses FWS's obligations
regarding critical habitat.

## STATUTORY FRAMEWORK

### Endangered Species Act

23.     In 1973, recognizing that certain species "have been so depleted in numbers that
they are in danger of or threatened with extinction," Congress enacted the ESA, 16 U.S.C. §§
1531–1544, "to provide a means whereby the ecosystems upon which endangered and threatened
species depend may be conserved, [and] to provide a program for the conservation of such
endangered species and threatened species." *Id.* § 1531(a)(2), (b). Considered "the most
comprehensive legislation for the preservation of endangered species ever enacted by any
nation," the ESA embodies the "plain intent" of Congress to "halt and reverse the trend toward
species extinction, whatever the cost." *TVA v. Hill*, 437 U.S. 153, 180, 184 (1978).

24.     The ESA defines conservation as "the use of all methods and procedures which
are necessary to bring any endangered species or threatened species to the point at which the
measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3). The
ESA's goal is not simply to prevent endangered and threatened species from becoming extinct
but to recover these species to the point where they no longer require the statute's protections.

25.     The ESA requires FWS to protect imperiled species by listing them as
"endangered" or "threatened." *Id.* § 1533(a)(1). A species is endangered if it "is in danger of
extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is

threatened if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

26.     Once a species is listed, it receives a host of important protections designed to prevent its extinction and aid its recovery, including one of the most crucial protections—safeguards for its "critical habitat." 16 U.S.C. § 1533(a)(3)(A).

27.     The legislative history of the ESA reveals that Congress recognized that the protection of habitat is essential to the recovery of listed species:

> [C]lassifying a species as endangered or threatened is only the first step in insuring its survival. Of equal or more importance is the determination of the habitat necessary for that species' continued existence . . . If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat.

H. REP. NO. 94-887 at 3 (1976). A critical habitat designation thus encompasses areas that require proper management to ensure a listed species not only survives but also recovers.

28.     Critical habitat includes specific areas occupied by the threatened or endangered species with "physical or biological features . . . essential to the conservation of the species and . . . which may require special management considerations or protection," as well as specific areas unoccupied by the species that "are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A). The ESA requires FWS to designate critical habitat concurrently with listing a species and, "from time-to-time thereafter as appropriate," revise the critical habitat designation. *Id.* § 1533(a)(3).

29.     Protecting a species' critical habitat is crucial for the protection and recovery of many listed species—particularly those that have become endangered or threatened because of historical and ongoing habitat loss or degradation. Evincing Congress' intent in enacting the ESA to "require agencies to afford first priority to the declared national policy of saving" listed

species, *TVA v. Hill*, 437 U.S. at 185, section 7(a)(2) requires all federal agencies to ensure, in consultation with FWS, their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of its designated "critical habitat." 16 U.S.C. § 1536(a)(2). In this way, a critical habitat designation provides significantly increased protections beyond those provided by listing alone. As a result, an inadequate or outdated critical habitat designation undermines the essential species safeguards embodied in section 7(a)(2) of the ESA.

30.     To ensure species at risk of extinction receive these essential habitat protections in a timely manner, Congress prioritized the designation of critical habitat. *Id.* § 1533(a)(3), (b)(6); see also *id*. § 1531(b) (statutory directive to "provide a means whereby the ecosystems upon which endangered . . . and threatened species depend may be conserved"). FWS is required, "to the maximum extent prudent and determinable," to designate critical habitat for a species "concurrently with making a determination" that it is endangered or threatened," *id.* § 1533(a)(3)(A), (b)(6)(C), and within one year of issuing a rule proposing critical habitat, *id*. § 1533(b)(6)(A)(ii). The critical habitat designation must be based on "the best scientific data available." *Id.* § 1533(b)(2).

31.     Recognizing that critical habitat designations may become outdated and need to be revised, Congress set forth a process and timetable for revising such designations. Any "interested person" may petition FWS under the APA, 5 U.S.C. § 553(e), for a rulemaking to revise designated critical habitat. 16 U.S.C. § 1533(b)(3)(D)(i). "To the maximum extent practicable, within 90 days after receiving the petition," FWS "shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted" and "promptly publish such finding in the Federal Register." *Id.*

32.    "Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the [FWS] shall determine how [it] intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register." *Id*. § 1533(b)(3)(D)(ii).

33.    Thereafter, FWS follows the rulemaking procedures specified by statute to propose and finalize regulations revising critical habitat. *Id.* § 1533(b)(5), (6). Unless otherwise specified in these subsections, the provisions of the APA, 5 U.S.C. § 553, apply to any regulation promulgated to carry out the purposes of the ESA. 16 U.S.C. § 1533(b)(4).

34.    The ESA also requires that FWS "shall develop and implement" plans for the recovery of listed species. *Id*. § 1533(f). Such plans must include, among other items, "a description of . . . site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species" and "objective, measurable criteria which, when met, would result in a determination . . . that the species be removed from the list" of endangered and threatened species. *Id.* § 1533(f)(1)(B).

35.    In addition to being legally mandated, critical habitat designations (and revisions thereto) have proven empirically to be essential to the survival and recovery of imperiled species. Species with critical habitat designations are twice as likely to recover as species without critical habitat designations.

**Administrative Procedure Act**

36.    The APA establishes general rules governing the issuance of proposed and final regulations by federal agencies. 5 U.S.C. §§ 551–559. It defines a "rule making" to mean the "process for formulating, amending, or repealing a rule." *Id.* § 551(5). Absent narrow

circumstances, a federal agency must publish notice of and allow public comment on any proposed "rule making." *Id.* § 553(b), (c).

37.     The APA establishes that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." *Id.* § 553(e). It also requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id.* § 555(b). Further, the agency must give "prompt notice" of the "denial in whole or in part" of a written petition, together with a "brief statement of the grounds for denial." *Id.* § 555(e).

38.     The APA establishes judicial review provisions for agency actions that apply unless statutes preclude judicial review or the action is committed to agency discretion by law. 5 U.S.C. §§ 701–706. "Agency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." *Id.* § 551(13) (emphasis added). Under the APA's judicial review provision, the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed[.]" *Id.* § 706(1).

## FACTS

### The Florida Manatee

39.     The Florida manatee's current range varies based on the season. In summer months, manatees can be found as far west as Texas, as far north as Massachusetts, and as far south as Cuba. Summer sightings in Alabama, Georgia, and the Carolinas are more common. However, throughout the year manatees are largely concentrated in Florida.

40.     Manatees can be found in shallow, slow-moving rivers, estuaries, saltwater bays, canals, and coastal areas, particularly where seagrass or freshwater vegetation flourish.

41.     Manatees are slow-moving mammals and most of their time is spent eating, resting, and traveling. Manatees are herbivorous, eating a large variety of submerged, emergent,

and floating plants, and can consume 10-15% of their body weight in vegetation daily. They may rest submerged at the bottom or just below the surface of the water but must surface to breathe air an average of every three to five minutes.

42.     FWS designated critical habitat for the Florida manatee in 1976, delineating specific waterways in Florida that were known to be important concentration areas for manatees at that time. 41 Fed. Reg. 41,914 (Sept. 24, 1976). FWS made the 1976 designation before the Act's 1978 amendments requiring that critical habitat designations include a description of the "physical and biological features essential to the conservation of the species," and before FWS developed critical habitat regulations and guidelines. Therefore, the manatee's critical habitat designation does not identify information that is required for critical habitat designations issued after 1978, such as specific physical and biological features of occupied critical habitat essential to the conservation of the species.

43.     FWS reclassified the Florida manatee from endangered to threatened in 2017. 82 Fed. Reg. 16,668 (Apr. 5, 2017). This reclassification did not affect the existing critical habitat designation or otherwise alter applicable ESA statutory protections.

### The Florida Manatee's Imperiled Habitat

44.     Florida manatees need adequate designated critical habitat to survive and recover. Their habitat faces numerous threats, including the loss of warm-water refuges, poor water quality that causes persistent harmful algal blooms, and the loss of seagrass upon which manatees rely as a vital food source.

45.     Manatees cannot survive for long periods in waters colder than 68 F°. Manatees exposed to cold water can develop cold stress syndrome, making them more vulnerable to other threats. Cold stress syndrome can also lead to death.

46.     During the winter of 2009–2010, for example, Florida experienced extremely cold weather for protracted periods. The FWC documented 282 manatee deaths directly attributable to cold stress. The following year, FWC documented 114 deaths due to cold stress. Experts expect an increase in number and severity of cold-water events in coming years due to climate change.

47.     When water temperatures drop below 68 F°, manatees seek refuge in warm water. Over half of Florida's manatees seek refuge from cold water in the warm-water discharges of power plant cooling water structures. Manatees that do not use human-made warm-water discharges use natural springs and thermal basins. There are currently 14 "major" warm-water sites (i.e., sites with at least one winter count of 50 or more manatees). Ten of these sites are outfalls from power plant cooling systems and four are freshwater springs, which do not drop below 70 F° even in winter months.

48.     Power companies will likely phase out power plant discharges within the next 30 years, while human-caused impacts, such as flow reductions and other activities, threaten Florida's naturally occurring springs and thermal basins. The threats to natural springs and warm-water habitat include diminishing spring flows from groundwater withdrawals for bottling, industrial and domestic use, obstructions that limit or preclude access, disturbance from recreational activities, algae proliferation and loss of nearby forage resources, and sea level rise.

49.     FWC and FWS released an updated and revised the Florida Manatee Warm-Water Habitat Action Plan in October 2020, which these agencies submitted to Florida Power and Light in December 2020. The action plan envisions protecting regional networks of warm-water refugia to help manatees transition away from power plants and other artificial warm-water sites. Dependence on artificial sources is not sustainable, as facilities can experience outages and a number of plants will likely shut down over the coming decades. FWS's failure to update the

13

Florida manatee's designated critical habitat to reflect the best available scientific data on the species' warm-water habitat needs is an impediment to the effective implementation of the Warm-Water Habitat Action Plan.

50.     As major power plant outfalls and natural warm-water springs are lost, manatees are struggling to find habitat. Even when manatees can move to alternative sites, food supplies, space, and temperatures for thermoregulating at alternative sites can be inadequate to support a large influx of displaced animals. Restoring and protecting natural warm-water winter habitat, like Crystal River National Wildlife Refuge and the Great Florida Riverway, are top conservation priorities for the Florida manatee. For example, restoration of the Ocklawaha River, a central linkage in the Great Florida Riverway, would allow hundreds of manatees to access essential warm-water habitat in several of the Ocklawaha's 20 freshwater springs and in Silver River. This warm-water refuge is currently inaccessible for large numbers of manatees due to the Kirkpatrick Dam and accompanying lock system that causes artificially high water levels, covering up the Ocklawaha's springs, and inhibiting large-scale manatee access to Silver River. FWS's failure to update the Florida manatee's designated critical habitat to reflect the best available scientific data on currently occupied as well as unoccupied critical habitat is an impediment to the work necessary to restore and protect natural warm-water winter habitat.



Florida manatees seeking warmth from power plant discharges during winter, *USGS*

### Recent Habitat Impacts and Related Manatee Mortality

51.     Increased human activity in areas supporting manatee populations also leads to other sources of mortality. From 2016–2019, 478 manatees died as a result of boat collisions. Each year saw more watercraft fatalities than the previous. In addition to mortalities, a Florida Fish and Wildlife Research Institute report concluded that one out of every four manatees analyzed bore evidence of ten or more watercraft strikes, and 96% of adult manatees had watercraft-related scars. Between 1981 and 2020, about half of the manatee mortalities from boat collisions occurred outside of designated critical habitat.



Adult manatee with scars from a boat propeller, Photo © Carol Grant

15

52.     Red tides in Florida are caused by the algal species *Karenia brevis*. When these toxic algae become highly concentrated in ocean waters, the harmful algal blooms known as red tides result. The brevetoxins that red tides produce can harm or kill manatees when the animals inhale the toxins while swimming through the algal blooms or when they consume toxins that have settled on seagrass, their primary food source. Red tide and other harmful algae blooms not only harm manatees directly but can also smother and kill off the seagrasses manatees eat.

53.     In 2018, red tide events in southwestern Florida caused the deaths of at least 288 manatees. Though 2018 was the most catastrophic red tide-related mortality event to date, there weremore than 30 confirmed red tide-related mortalities each year in 1996, 2002, 2003, 2005, 2006, 2007, 2012, 2013, 2016, 2017, 2018, 2019, and 2021. There were 100 or more red tide-related mortalities documented in 1996, 2003, 2013, and 2018.

54.     Although red tides are a naturally occurring process, their timing and severity can be influenced by natural factors, such as ocean currents, strong winds, and drought conditions, as well as by anthropogenic factors, such as water pollution. Nitrogen and phosphorus, for example, fuel algae growth, including red tide. Discharges from septic and sewer systems as well as stormwater runoff are examples of ways nitrogen and phosphorus enter the surface waters and contribute to harmful algal blooms.

55.     In March 2021, the Piney Point phosphate plant discharged more than 200 million gallons of wastewater into Tampa Bay. This wastewater contained high levels of nutrient pollutants such as ammonia, nitrogen, and phosphorus, which can significantly worsen harmful algal blooms. Shortly after the Piney Point discharge, a red tide bloom appeared in Tampa Bay and persisted for several months. Since June 2021, more than 30 manatees have died from red tide in and around Tampa Bay.

56.     A 2021 Unusual Mortality Event declared under the Marine Mammal Protection Act, 16 U.S.C. §§ 1421-1421h, on the Atlantic coast of Florida from Brevard County to Monroe County, with the epicenter in the Indian River Lagoon in Brevard County, highlights another water-quality-based threat facing the Florida manatee. More than 1,100 manatees died in Florida in 2021. This amount is more than double Florida's five-year annual manatee mortality average and is about 13% of the Florida manatee's estimated population. At least 50% of manatee deaths in 2021 occurred in the Indian River Lagoon due to starvation and malnutrition from nutrient pollution that depleted local seagrass beds by contributing to harmful algal blooms.

57.     For many years, the Indian River Lagoon has been recognized as the most biodiverse estuary in North America and an important year-round habitat for manatees due to historically abundant seagrass, which manatees eat, as well as an important warm-water refuge due to warm-water discharges from a local power plant, around which manatees congregate during cold weather.

58.     Increased nitrogen and phosphorous pollution in the lagoon have led to declines in water quality and fueled harmful algae blooms which have killed tens of thousands of acres of seagrass.

59.     While the lagoon is included in the existing critical habitat designation, the "physical or biological features . . . essential to the conservation of the species and . . . which may require special management considerations or protection" of the lagoon are not included, compromising the efficacy of the existing designation.

## 2008 Petition to Revise Critical Habitat

60.     FWS's recovery plans for the manatee have repeatedly recognized the need to

designate appropriate areas as critical habitat. For example, the first manatee recovery plan

issued in 1980 provided that manatee "critical habitats must be identified and protected" and

called for the designation of critical habitat in areas not covered by the initial designation. The

1989 recovery plan established as an "objective" the "designat[ion] [of] additional areas as

'Critical Habitat.'" The 2001 recovery plan stated that "much has been learned about manatee

distribution in the decades since manatee critical habitat was originally defined" and that FWS

therefore "should assess the need to revise critical habitat for the Florida manatee." Nonetheless,

FWS has never taken any steps to actually review and revise the designation.

61.     Due to the ongoing destruction and degradation of manatee habitat, and FWS's

failure to implement the critical habitat review and revision called for by the agency's recovery

plans, on December 19, 2008, the Center, Defenders, and Save the Manatee Club submitted a

formal rulemaking petition to FWS under the APA and ESA. The petition requested that FWS

initiate and finalize a rulemaking to revise and strengthen the critical habitat designation that

FWS had long conceded to be outdated and inadequate to conserve manatees.  On September 16,

2009, FWS published a 90-day positive finding regarding the petition, determining that revising

critical habitat for the Florida manatee may be warranted. 74 Fed. Reg 49,842 (Sept 29, 2009). In

the finding, FWS agreed that "the 1976 critical habitat designations did not address the physical

and biological features essential to the conservation of the manatee," and that "scientific

information regarding manatee conservation has dramatically increased since the original

designation." *Id*. at 49,844.

62.     On January 12, 2010, after "a thorough review of all available scientific and commercial information," FWS found that "revisions to critical habitat for the Florida manatee are warranted." 75 Fed. Reg. 1574 (Jan. 12, 2010). FWS found that  "the geographic areas originally described as manatee critical habitat need to be updated, based on recent scientific studies of manatee distribution, habitat use, and habitat needs," and that "since the original designation, we have more information on the specific habitat needs of the Florida manatee, including the use of warm-water sites." *Id*. at 1577. FWS noted that the "loss of Florida's warm-water habitats is one of the leading threats facing the manatee population." *Id.* at 1575.

63.     In its 12-month finding, FWS further stated that "[w]e intend to identify the physical and biological features essential to conservation of the species, in order to address the ecological and conservation needs of the Florida manatee," *id.* at 1577, and that proceeding with a "revised critical habitat designation for the Florida manatee is important for identifying the specific areas essential to the conservation of the species or which contain the essential features." *Id*. at 1578. Yet, instead of embarking on these actions, or even setting forth any timetable for doing so, FWS stated that "sufficient funds are not available due to higher priority actions such as court-ordered listing-related actions and judicially approved settlement agreements" and that it intended "to initiate rulemaking when we complete [] higher priorities and have the necessary resources to do so." *Id.* at 1574. In the eleven years since, it has never initiated, let alone completed, the critical habitat revision that it declared is "warranted" in order to conserve the manatee.

## CLAIMS FOR RELIEF

<u>CLAIM ONE: APA VIOLATIONS</u>

64.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–63.

65.    The ESA and APA provide that interested persons such as Plaintiffs may petition FWS pursuant to the APA, 5 U.S.C. § 553(e), for the issuance of a rule to revise a critical habitat designation. 16 U.S.C. § 1533(b)(3)(D)(i). Plaintiffs exercised this right in 2008 by formally petitioning FWS to revise the Florida manatee's designated critical habitat.

66.    The APA requires FWS to proceed to conclude all matters presented to it via rulemaking petitions, including Plaintiffs' 2008 Petition, "within a reasonable time." 5 U.S.C. § 555(b). It has been 13 years since Plaintiffs petitioned FWS to revise critical habitat, 12 years since FWS agreed revision may be warranted, and 11 years since FWS determined that revision of critical habitat is warranted. In this time, FWS has never concluded the matters presented to it in Plaintiffs' 2008 Petition by proposing and finalizing a regulation to accomplish the critical habitat revision. By failing to "conclude[] the matters presented to it" within a "reasonable time," FWS is in violation of the APA.

67.    FWS's action as described above constitutes failure to act within the meaning of the APA, 5 U.S.C. § 551(13). FWS's failure to act constitutes agency action unlawfully withheld or unreasonably delayed within the meaning of the APA, 5 U.S.C. § 706(1). Plaintiffs and their members are harmed and will continue to be harmed by FWS's failure to propose and finalize a regulation to revise the Florida manatee's critical habitat in response to the 2008 Petition. Granting Plaintiffs' requested relief will remedy these harms.

## CLAIM TWO: ESA VIOLATIONS

68. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1–63.

69. Having determined, in its own formal recovery plans and in response to Plaintiffs' rulemaking petition, that the revision of critical habitat is both warranted and necessary to conserve the manatee, FWS may not, consistent with its obligations under the ESA to recover endangered and threatened species, indefinitely refuse to engage in the needed critical habitat revisions while manatees and the habitat on which they depend continue to deteriorate.

70. A "warranted" determination made pursuant to ESA section 4(b)(3)(D)(ii), while not imposing a specific timetable on FWS, does impose on FWS an obligation to initiate and complete the revision within *some* reasonable time frame. Consequently, FWS's failure even to *initiate* the process for revising the manatee's critical habitat—more than a decade after publishing a formal finding that such revision is warranted—contravenes the agency's obligation under ESA section 4(b)(D)(ii) to revise the designation within a reasonable timeframe. *See also* 16 U.S.C. § 1531(c) (declaring the "policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act").

71. FWS's ongoing failure to revise the critical habitat designation also conflicts with ESA section 4(f)'s command that FWS "shall . . . implement" recovery plans. Because FWS's recovery plans for the manatee have consistently recognized the need to revise and update the manatee's critical habitat designation, FWS is violating its duty to "implement" its recovery plans by failing to undertake the necessary revision.

72. These violations of the ESA are undermining other essential statutory safeguards for the manatee. In particular, the obligation of FWS, along with other federal agencies, to avoid the "destruction or adverse modification" of the manatee's critical habitat, 16 U.S.C. § 1536(a)(2), has been rendered largely useless as a direct result of FWS's ongoing failure to promulgate a critical habitat designation that reflects the manatee's current habitat needs. This subversion of the ESA's comprehensive statutory scheme for conserving imperiled species such as the manatee is impairing, and will continue to impair, the interests of Plaintiffs and their members in the survival and recovery of the manatee. Granting Plaintiffs' requested relief will remedy these harms.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(1)    Declare that FWS's ongoing failure to revise the Florida manatee's critical habitat in response to Plaintiffs' 2008 Petition constitutes agency action unlawfully withheld or unreasonably delayed in violation of the APA;

(2)    Declare that FWS's ongoing failure to revise the Florida manatee's critical habitat after its 2010 finding that such revision is warranted but precluded violates the ESA;

(3)    Order FWS to publish a proposed rule to revise the Florida manatee's critical habitat within 120 days of the Court's order;

(4)    Order FWS to publish a final rule to revise the Florida manatee's critical habitat within the timeframe provided for by the ESA, 16 U.S.C. § 1533(b)(6);

(5)    Award Plaintiffs the costs of this action, including reasonable attorneys' fees; and

(6)    Provide such other relief as the Court deems just and proper.

DATED: February 1, 2022     Respectfully submitted,

/s/ <u>Jaclyn M. Lopez</u>
Jaclyn M. Lopez (D.C. Bar No. FL0017)
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190
jlopez@biologicaldiversity.org

/s/ <u>Jane P. Davenport</u>
Jane P. Davenport (DC Bar 474585)
Defenders of Wildlife
1130 17th St NW
Washington, DC 20036
Tel: (202) 772-3274
jdavenport@defenders.org

/s/ <u>Anne M. Harvey</u>
Anne M. Harvey
(*pro hac vice* admission pending)
Law Offices of F. Bryan Brice, Jr.
137 W. Hargett St., Suite 600
Raleigh, NC 27601
Tel: (919) 754-1600
anne@attybryanbrice.com

*Attorneys for Plaintiffs*